J-S41038-20

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA, :    IN THE SUPERIOR COURT OF
                                 :           PENNSYLVANIA
             Appellee           :
                                   :
              v.                    :
                                   :
BRAXTON ROBERT BECKER,         :
                                   :
           Appellant         :    No. 1841 MDA 2019

Appeal from the Judgment of Sentence Entered August 21, 2019
in the Court of Common Pleas of Centre County
Criminal Division, at No(s): CP-14-CR-0001893-2018.

BEFORE:    KUNSELMAN, J., McLAUGHLIN, J. and STRASSBURGER, J.*

MEMORANDUM BY KUNSELMAN, J.:           **FILED APRIL 21, 2021**

Braxton Robert Becker appeals from judgment of sentence[1] imposed after a jury found him guilty of hindering apprehension or prosecution.[2] We affirm.

We derive the following facts from the record. Becker's charges stem from the deletion of video footage from his fraternity house's surveillance system during a police investigation into the death of one of the fraternity's potential new members, Timothy Piazza.

---

[1] We note that Becker purported to appeal from the October 8, 2019 order denying his post-sentence motions. "In a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." ***Commonwealth v. Shamberger***, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*) (citation omitted). We have corrected the caption accordingly.

[2] 18 Pa.C.S.A. § 5105(a)(3).

*Retired Senior Judge assigned to the Superior Court.

By way of background, Becker was a member of the Beta Theta Pi fraternity on the campus of Pennsylvania State University in State College, Pennsylvania.

In February 2017, Becker served on the fraternity's executive board as its house manager. In that role, he was responsible for the fraternity house's video surveillance system and was the only fraternity member who knew how the system operated. The surveillance system was comprised of sixteen cameras and two digital video recorder (DVR) boxes, DVR-1 and DVR-2. Relevant to this appeal, the system included cameras in the house's basement.

On Thursday, February 2, 2017, the fraternity held a party at its house for potential new members consisting of, *inter alia*, a drinking obstacle course, where fraternity members directed potential new members to drink excessive amounts of alcohol in short periods of time at different drinking stations. During the party, Piazza, who was 19 years old, was a potential new member, and participated in the drinking obstacle course, became severely intoxicated. At approximately 11:20 p.m., Piazza fell down the fraternity house's basement stairs, sustaining serious injuries. The fraternity house's surveillance system recorded portions of the party.

The next morning, just before 11:00 a.m., on Friday, February 3, 2017, a State College police officer responded to a 911 call at the fraternity house. The officer found Piazza unconscious on a couch. Fraternity members

told the officer that Piazza had fallen down the basement stairs the previous night. Piazza was transported by ambulance to a medical center.

At about 2:00 p.m. the same day, February 3, 2017, Detective Craig Ripka and Lieutenant Keith Robb of the State College Police Department visited the fraternity house to investigate Piazza's injury. Fraternity members told them about the party and Piazza's fall. The officers immediately observed video cameras in rooms of the house and asked for assistance in acquiring video footage of Piazza's fall. The fraternity's president, Brendan Young, directed the officers to Becker.

Becker agreed to obtain the video footage and said he would contact them when he had it ready. After about two hours at the house, Detective Ripka and Lieutenant Robb returned to the police station. Less than an hour later, Becker notified them the video footage was ready and Detective Ripka returned to pick it up. Becker provided him with two video clips on a thumb drive. Upon viewing the clips at the police station that evening, Detective Ripka discovered that neither video clip related to what police had requested.

Both clips were from earlier in the day on Friday, February 3, 2017, the first from 7:00 to 7:15 a.m., and the second from 9:29 to 9:35 a.m. In both clips, the camera angles captured the upstairs areas of the house and Piazza's condition the morning after his fall, but they did not show the party or Piazza's fall. Before leaving work that evening, Detective Ripka contacted

Becker to request additional video footage. Becker agreed and told Detective Ripka to contact him on Monday, February 6, 2017, to arrange pickup of the requested video on Monday afternoon.

Meanwhile, throughout the day on February 3, 2017, Becker exchanged text messages with his fraternity members, expressing his willingness to delete the fraternity house's video surveillance footage and to lie about its existence. At 12:42 p.m. on Friday, February 3, 2017, the fraternity's treasurer, Adam Mengden, sent Becker the following text message, "Erasing the cameras could be the look as look [sic] as long as no one found out[.]" N.T., 5/28/2019, at 247, Exh. 48. A few minutes later at 12:46 p.m., Becker responded, "I think the exact same thing[.]" *Id.* at 248, Exh. 48.

Seconds later, Becker texted Mengden again. This time, he referenced a service call for the video surveillance system he had arranged a few days before the party. A technician had just serviced the surveillance equipment at the house on January 30, 2017, and confirmed the system was operational. Becker's text to Mengden read, "The guy [service technician] told me to check them in like a few days to make sure they were recording. I could say I checked and they weren't and just turned them on[.]" *Id.* Around the same time, Becker discussed deleting the video footage in a

Microsoft GroupMe[3] messaging application he shared with the fraternity's executive board members. At 12:39 p.m. on February 3, 2017, Becker stated to the group, "We just got the cameras fixed … so that's not good if they're looking into what happened[.]" N.T., 5/28/2019, at 256, Exh. 49 (ellipsis in original). He added a few seconds later, "I could see if I could erase last night and say they didn't start recording till today. The entire obstical [*sic*] course is recorded on there probably if the house board is looking[.]" ***Id.***

Later that same day, Becker and Daniel Casey, the fraternity's administrative vice president and pledge master, exchanged text messages regarding the two video clips Becker had provided to police. At 5:31 p.m. on February 3, 2017, Casey sent Becker the following text messages, "What times did [police] take tape of[?]" and "Like is the obstacle course in it?" N.T., 5/28/2019, at 225-27, Exh. 37 at 62-63. One minute later, Becker responded, "Nah. They took tapes from 7 and 930 am[.]" ***Id.*** Casey quickly replied, "Fuck yes[.]" ***Id.*** Seconds later, Appellant sent Casey two messages: "We should be good" and "On that front at least[.]" ***Id.***

The next day, Saturday, February 4, 2017, Piazza died from his injuries.

---

[3] "GroupMe is an Internet-based application that allows a user to create a group and add other users. Each member of the group can then send text communications to the entire group." N.T., 5/28/2017, at 250-51.

The morning of Monday, February 6, 2017, Detective Ripka and Officer Adam Salyards, a community relations officer with the State College Police Department, returned to the fraternity house to ask for additional video footage. Becker agreed and took Detective Ripka and Officer Salyards to a small audiovisual (AV) closet on the third floor of the house, which housed the video surveillance equipment. At 10:29 a.m., Becker unlocked the closet door using his key. Detective Ripka and Officer Salyards asked Becker to provide video footage from all sixteen cameras in the house from 8:00 p.m. on February 2, 2017, to 11:45 a.m. on February 3, 2017, which would include the time from before Piazza's fall to when he was transported to the hospital.

Becker immediately sat at the console in the AV closet and began downloading video footage from DVR-1 and DVR-2 using a remote control. Becker had sole possession and control over the video surveillance equipment and remote control for more than thirty minutes, from about 10:30 a.m. to just after 11:00 a.m. Detective Ripka noted that Becker had "a very good understanding and working knowledge of the [video surveillance] system," did not need to consult an instruction manual, knew how many days the recorded video footage is retained before being overwritten, and knew the number of minutes of discrepancy between real time and the time-stamp on the video footage. N.T. 5/28/19 *Id.* at 81.

Shortly after 11:00 a.m., Lieutenant Robb arrived with an information technology (IT) specialist from the Borough of State College to assist with the download. After several hours of downloading, police realized it would take several days to download the requested video footage; thus, the IT specialist removed the equipment and police brought it to the police station to finish the download. The IT department put a working copy of the February 2-3, 2017 video footage on a terabyte hard drive for detectives to use in their investigation since viewing footage directly from the video equipment was too slow. The DVR boxes were placed in the evidence room. At this time, police did not question why the February 2-3, 2017 video footage did not contain anything from the basement because fraternity members told them that the basement cameras were not working at the time of the party.

However, several months later, in July 2017, as part of a separate investigation by the State College Police Department involving a different incident at the same fraternity, police discovered that the video surveillance system captured video footage from the fraternity's basement on dates other than those relevant to the investigation into Piazza's fall on February 2, 2017. At this point, police discovered that there was no video footage of the basement prior to 10:39 a.m. on February 6, 2017, despite the existence of basement video footage on other dates and times.

Based on this discovery, the State College Police Department sent the two DVR boxes to the Federal Bureau of Investigation (FBI) to be analyzed forensically.

At trial, the Commonwealth presented the testimony of an expert in digital forensic analysis, who had determined at the Philadelphia Regional Computer Forensics Laboratory that the video footage captured prior to Monday, February 6, 2017, had been deleted from DVR-2. According to DVR-2's system log, the deletion occurred at 10:39 a.m. on February 6, 2017, which was during the time that only Becker was seated at the equipment console purportedly downloading video footage for Detective Ripka and Officer Salyards. While Becker was sitting at and operating the DVR boxes in the AV closet, Detective Ripka and Officer Salyards testified they were not watching him every second. They were standing either in the AV closet or its vicinity while Becker was seated at the console in the closet, but Detective Ripka and Officer Salyards were also tending to other tasks, such as completing consent forms, talking with other fraternity members, and making phone calls. DVR-2's system log reflected that the user had selected the "Clear All Data" event, deleting all of the video that had been recorded on the hard drive. The expert was able to recover the deleted video footage from DVR-2. However, due to physical damage to its hard drive, no video footage could be recovered from DVR-1 at either the Philadelphia laboratory

or the FBI laboratory in Quantico, Virginia, where it had been sent for further analysis.

The Commonwealth also presented an expert in Speco Technologies products, the manufacturer of the two DVR boxes, who testified regarding the "Clear All Data" option. She explained the "Clear All Data" selection on DVR-2 on February 6, 2017 was a manual deletion by someone using a remote control or mouse while seated at the physical DVR machine. The expert further testified that, while using the remote control, the "Clear All Data" event could be completed in less than thirty seconds.

Based on the foregoing, Becker was charged with tampering with or fabricating physical evidence (tampering); obstructing the administration of law or other governmental function (obstructing); and hindering apprehension or prosecution (hindering). After a three-day jury trial held May 28-30, 2019, the jury found Becker guilty of hindering, and not guilty of the two other aforesaid charges. On August 21, 2019, Becker was sentenced to two years of probation, 100 hours of community service, and a $5,000 fine. Appellant timely filed three post-sentence motions for judgment of acquittal, to vacate and/or reconsider the fine imposed, and for

cquittal/arrest of judgment. The trial court denied the post-sentence motions

following a hearing. This timely-filed appeal followed.[4]

On appeal, Beckert presents two issues for our review.

I.    Whether the trial court should have granted Appellant's motion for judgment of acquittal for obstruction of justice when the jury found [Appellant] not guilty of tampering with evidence, deleting a video, which is the basis of the obstruction of justice charge.[5]

II.   Whether the verdict is against the weight of the evidence.

Becker's Brief at 5 (capitalization altered; suggested answers omitted).

In his first issue, Becker contends the trial court erred when it denied

his motion for judgment of acquittal of hindering. Appellant's Brief at 11-16.

We consider this issue mindful of the following.

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge.

The standard of review for claims of insufficient evidence is well-settled. With respect to such claims, we consider the evidence in the light most favorable to the Commonwealth as verdict winner. In that light, we decide if the evidence and all reasonable inferences from that evidence are sufficient to establish the elements of the offense beyond a reasonable doubt. We keep in

---

[4] Becker complied with Pa.R.A.P. 1925(b). In lieu of a Pa.R.A.P. 1925(a) opinion, the trial court referred us to its October 8, 2019 opinion and order denying Becker's post-sentence motions.

[5] It appears Becker mistakenly worded this issue in both his statement of questions and Rule 1925(b) statement. Becker was found guilty of hindering and not guilty of obstructing. We presume Becker challenges his hindering conviction, as that is what he argued in his post-sentence motion and the argument section of his brief.

mind that it was for the trier of fact to determine the weight of the evidence and the credibility of witnesses. The jury was free to believe all, part or none of the evidence. This Court may not weigh the evidence or substitute its judgment for that of the factfinder.

***Commonwealth v. Devries***, 112 A.3d 663, 667 (Pa. Super. 2015) (citations omitted). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt."

***Commonwealth v. Antidormi***, 84 A.3d 736, 756 (Pa. Super. 2014).

The hindering statute provides in relevant part as follows.

**(a) Offense defined.—**A person commits an offense if, with intent to hinder the apprehension, prosecution, conviction or punishment of another for crime …, he:

> (3) conceals or destroys evidence of the crime, **or** tampers with a witness, informant, document or other source of information, regardless of its admissibility in evidence[.]

18 Pa.C.S. § 5105(a)(3) (some emphasis added).

Becker argues his hindering conviction should be overturned because the jury acquitted him of tampering.[6] Becker's Brief at 12. Becker maintains

---

[6] The tampering statute provides in relevant part as follows.

> A person commits a misdemeanor of the second degree if, believing that an official proceeding or investigation is pending or about to be instituted, he:

> > (1) alters, destroys, conceals or removes any record, document or thing with intent to impair its verity or availability in such proceeding or investigation[.]

*(Footnote Continued Next Page)*

that because tampering is a statutory element of hindering, and he was acquitted of tampering, he must also be acquitted of hindering. ***Id.***

By its plain language, however, tampering is only one alternative element of the hindering statute as evidenced by the use of the word "or" in subsection (a)(3). Acquittal of tampering does not preclude the jury from finding Becker concealed or destroyed evidence under the hindering statute.

As detailed above, the jury heard testimony from two detectives assigned to the investigation, two police officers involved in the investigation, an FBI expert in digital forensic analysis who recovered some of the deleted video footage, a different expert who explained the "Clear All Data" function, and the technician who serviced and confirmed the video surveillance equipment was working properly days before Piazza's fall.

In addition, the Commonwealth presented evidence of, *inter alia*, text messages of Becker discussing deleting the video footage on the same day he knew police were investigating Piazza's fall; photographs of Becker unlocking the AV closet and sitting at the equipment console with the DVR remote in his hand just minutes before the deletion occurred; the system log of DVR-2 showing the "Clear All Data" entry at 10:39 a.m. on February 6, 2017, a time when Becker was the only person seated at the console and police were not continuously observing him; expert testimony that the

*(Footnote Continued)* ————————————
18 Pa.C.S. § 4910(1).

- 12 -

manual deletion could take less than 30 seconds; and the deleted video footage that was recovered by the FBI. This evidence was sufficient to allow the jury to conclude that Becker wanted and was willing to delete the video footage and lie about its existence, that Becker had the ability and opportunity to do so, and that the video was actually deleted.

The combination of the evidence links Becker beyond a reasonable doubt as the one who deleted surveillance video footage of the dates and times requested by police in connection with their investigation into Piazza's injuries and death. Accordingly, we conclude the evidence and all reasonable inferences therefrom, viewed in the light most favorable to the Commonwealth, were sufficient to establish the elements of hindering beyond a reasonable doubt.

Nonetheless, on appeal Becker relies on three cases to support his argument that his acquittal of the tampering offense means he must also be acquitted of the hindering offense: **Commonwealth v. Reed**, 9 A.3d 1138 (Pa. 2010), **Commonwealth v. Magliocco**, 883 A.2d 479 (Pa. 2005), and **Commonwealth v. Baker-Myers**, 210 A.3d 1093 (Pa. Super. 2019) (*en banc*). Appellant's Brief at 12-18. The trial court found Appellant's reliance on the cases misplaced. Opinion and Order on Defendant's Post-Sentence Motions, 10/8/2019, at 2.

Upon review, we agree that the cases upon which Becker relies are inapposite. None of the cases involved the crimes herein. The plain language

of the criminal statutes at issue in **Reed**, **Magliocco**, and **Baker-Myers** each specifically stated that the grading or an element of the offense was contingent upon the commission of an underlying predicate offense specifically referenced within the Crimes Code, 18 Pa.C.S.A. §§ 101-9546. In contrast, tampering is not a predicate offense of hindering. Moreover, the hindering statute does not, by its express terms, contain any predicate offense as an element of the crime.

Our Supreme Court has made clear that **Magliocco** "was grounded in the delineation of the elements of ethnic intimidation set forth in the text of that statute." **Commonwealth v. Miller**, 35 A.3d 1206, 1212-13 (Pa. 2012) (reaffirming "the long-standing and well-established principle that consistency in a verdict is not required" and holding inconsistent jury verdicts of guilt on second-degree murder charge but acquittal on the predicate felony of robbery did not require vacatur of second-degree murder conviction). As our Supreme Court noted, "**Magliocco** and **Reed** are distinguished by the plain text of their particular governing statutes, which controlled our disposition of those cases, but are not generally applicable to other offenses." **Miller**, 35 A.3d at 1213. The same holds true for the statute at issue in **Baker-Myers**. Accordingly, we disagree with Becker that these cases afford him relief.

Insofar as Becker argues that the trial court should have granted his motion for judgment of acquittal based on inconsistent verdicts, "[i]t is well-

settled that inconsistent verdicts are permissible in this Commonwealth."

***Commonwealth v. Barnes***, 167 A.3d 110, 120 (Pa. Super. 2017) (*en banc*) (citation omitted).

> We note first that inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Consistency in verdicts in criminal cases is not necessary. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is evidence to support the verdict. The rule that inconsistent verdicts do not constitute reversible error applies even where the acquitted offense is a lesser included offense of the charge for which a defendant is found guilty.

***Id.*** (quoting ***Commonwealth v. Petteway***, 847 A.2d 713, 718 (Pa. Super. 2004)).

As our Supreme Court noted in ***Miller***, "[w]hile recognizing that the jury's verdict appears to be inconsistent, we refuse to inquire into or speculate upon the nature of the jury's deliberations or the rationale behind the jury's decision. Whether the jury's verdict was the result of mistake, compromise, lenity, or any other fact is not a question" for this Court to review. 35 A.3d at 1213 (citations omitted). Accordingly, having determined there is sufficient evidence to support the verdict, we will not disturb Becker's hindering conviction on this basis.

Turning to Becker's challenge to the weight of the evidence, the trial court must use the following standard in assessing a weight-of-the-evidence claim.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Izurieta*, 171 A.3d 803, 809 (Pa. Super. 2017) (citation omitted).

On appeal, we evaluate the trial court's ruling with the following in mind.

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Beatty*, 227 A.3d 1277, 1285-86 (Pa. Super. 2020) (citations omitted).

Before we address the merits of Becker's weight claim, we must determine whether Becker has preserved it for our review. ***Commonwealth v. Rivera***, 238 A.3d 482, 495 (Pa. Super. 2020).

In his post-sentence motions, Becker's entire weight-of-the-evidence claim consisted of the following sentence: "The verdict is contrary to the weight of the evidence in that the evidence preponderates sufficiently against the verdicts to [*sic*] that a serious miscarriage of justice has resulted with respect to the conviction." Post-Sentence Motion, 9/3/2019, at ¶ 21. At the October 3, 2019 hearing, Becker did not make any argument relating to his weight claim. ***See generally***, N.T., 10/3/2019. In his Rule 1925(b) statement, Becker raised a combined, boilerplate sufficiency and weight claim: "Whether the verdict is against the weight and sufficiency of the evidence." Rule 1925(b) Statement, 11/26/2019, at ¶ 3.

Improper preservation of a challenge to the weight of the evidence before the trial court renders the challenge waived on appeal.

> A weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. Pa.R.Crim.P. 607. Failure to properly preserve the claim will result in waiver, even if the trial court addresses the issue in its opinion.

> A boilerplate motion, either that "the evidence was insufficient to support the verdict," or that "the verdict was against the weight of the evidence," is not a precise statement of issues and grounds relied upon. Such assignments of error not only do not foster but discourage alert and zealous advocacy, for anyone may make them without giving thought to what the issues really are.

*Rivera*, 238 A.3d at 497 (some citations, quotation marks, and brackets omitted; some capitalization altered). Thus,

> a post-verdict motion, either that "the evidence was insufficient to support the verdict," or that "the verdict was against the weight of the evidence," will preserve no issue for appellate review unless the motion goes on to specify in what respect the evidence was insufficient, or why the verdict was against the weight of the evidence.

*Id.* (citation omitted).

Instantly, we conclude the single, conclusory, and boilerplate sentence in Becker's post-sentence motion, which failed to specify why the verdict was against the weight of the evidence, is inadequate to preserve Becker's weight claim on appeal. *See id.*

For the foregoing reasons, Becker is not entitled to relief on his claims and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/21/2021